# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE

Assigned on Briefs February 21, 2024

## STATE OF TENNESSEE v. COURTNEY B. MATHEWS

**Appeal from the Circuit Court for Montgomery County**
**No. 33791     Don R. Ash, Senior Judge[1]**

_____

### No. M2022-01210-CCA-R3-CD

_____

In 1996, a Montgomery County jury convicted the Defendant, Courtney B. Mathews, of four counts of felony murder and one count of especially aggravated robbery. The Defendant received consecutive terms of life imprisonment without the possibility of parole for each felony murder conviction and twenty-five years for the especially aggravated robbery conviction. This court affirmed his convictions and sentences on direct appeal. The Defendant sought post-conviction relief, and this court subsequently held that he was entitled to post-conviction relief with respect to the motion for a new trial. On remand, the Defendant filed an amended motion for a new trial, and following a hearing, the trial court reduced his sentence for especially aggravated robbery to twenty years but otherwise denied his motion. On appeal, the Defendant raises challenges regarding the sufficiency of the evidence supporting his conviction for especially aggravated robbery, the validity of the indictment, and the State's failure to elect an offense; the admission into evidence of a black denim jacket; the State's failure to correct false testimony; the trial court's failure to grant a mistrial based on an impermissible outside influence on the jury; the trial court's refusal to allow additional closing arguments after it gave a supplemental jury instruction on criminal responsibility during jury deliberations; the trial court's failure to issue an enhanced identification jury instruction; the trial court's jury instruction on the reliability of fingerprint evidence; the State's reliance on the especially heinous, atrocious, or cruel aggravating circumstance during his trial while asserting that the aggravating circumstance could not be supported during the co-defendant's subsequent trial; and the trial judge's failure to recuse himself from the trial and post-trial proceedings. The Defendant also argues that the cumulative effect of the errors entitles him to a new trial. Upon our review, we respectfully disagree and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Circuit Court Affirmed**

_____

[1] Judge Ash presided over the renewed motion for a new trial, and he did not participate in the original trial or post-conviction proceedings.

TOM GREENHOLTZ, J., delivered the opinion of the court, in which MATTHEW J. WILSON, J., joined. JAMES CURWOOD WITT, JR., J., not participating.[2]

Courtney B. Mathews (on appeal), pro se, Clifton, Tennessee; and Luke A. Evans (at hearing), Murfreesboro, Tennessee, for the appellant, Courtney B. Mathews.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Robert J. Nash, District Attorney General; and Arthur E. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

### A.     THE ROBBERY AND MURDERS

This case originated from a robbery and quadruple homicide at a Clarksville Taco Bell restaurant on January 30, 1994. The victims were four employees: Kevin Campbell, Angela Wyatt, Patricia Price, and Marsha Klopp. The Defendant, a Taco Bell employee and a member of the United States Army stationed at Fort Campbell, Kentucky, was arrested and charged with these crimes. *State v. Matthews*, No. M2005-00843-CCA-R3-CD, 2008 WL 2662450, at *2-9 (Tenn. Crim. App. July 8, 2008), *perm. app. denied* (Tenn. Apr. 10, 2015).[3]

The Defendant began working at Taco Bell on January 19, 1994, to earn money for car damages. During his orientation, he asked unusual questions about the restaurant's structure, security cameras, roof accessibility, and closing procedures. He also requested a special key. *Id.* at *2, 5.

At a party on January 21, 1994, James Bowen overheard the Defendant discussing robbing Taco Bell with three other people, including later co-defendant David Housler. In this conversation, the Defendant described the restaurant as "the easiest place to rob." *Id.*

---

[2]     The Honorable James Curwood Witt, Jr., passed away on August 17, 2024, and did not participate in the filing of this opinion. We acknowledge his twenty-seven years of dedicated and faithful service to this court, both as a former presiding judge and as its longest-serving member.

[3]     In our 2008 opinion, we noted that the Defendant's surname was likely spelled "Mathews." However, consistent with the customary practice, we used the spelling of "Matthews" as set forth in the charging instrument. *See Matthews*, 2008 WL 2662450, at *1 n.1.

Later, the Defendant inquired about safe access at Fort Campbell's mail room, telling a coworker that "something big was going to happen" that weekend. *Id.*

On the evening of January 29, the Defendant prepared weapons and clothing at his shared duplex. He wiped fingerprints from a 9mm handgun and a shotgun, placing them in a black bag. He dressed in layers, stating the change of clothes was needed if "he got into trouble with the guns." Before leaving, he removed personal items from his wallet and took a bowling bag as an alibi. *Id.* at *2, 5.

Around 1:30 a.m. on January 30, after the dining room had closed, two drive-thru customers reported seeing an African American man, later identified as the Defendant, inside the restaurant. *Id.* at *6. The victims were discovered at approximately 7:45 a.m. when the shift manager arrived. Police found all four victims in the employee area with multiple gunshot wounds. *Id.* at *4, 7-8.

Following the murders, the Defendant provided details of the crime to his roommates, Carl and Shawntea Ward. He had scratches on his face and stains on his shirt, claiming he had lost his firearms, jacket, and wallet during a "scuffle" at a gas station. On February 1, the Defendant attempted suicide, telling Mr. Ward that he "killed four people" and didn't deserve to live. *Id.* at *2-4.

## B.    THE INVESTIGATION

Officers recovered numerous 9mm bullets and casings at the crime scene, all fired from the same weapon. Although the 9mm firearm wasn't found, bullet fragments and a casing from the Defendant's bedroom (from a prior incident) matched evidence from Taco Bell. Bullets recovered from victims were fired from the same gun as fragments from the Defendant's bedroom. *Id.* at *7.

The safe was opened by shooting the dial with a shotgun. The shell casing matched the Defendant's shotgun, later found near his residence. *Id.* at *7. A black jacket belonging to the Defendant, with one victim's blood on it, was recovered from a nearby river. Plastic fragments from this jacket matched those on the safe. *Id.* at *6-7.

A manager at Taco Bell determined that $2,967.68 was taken during the robbery, and officers located $2,576 under a panel in the bottom of the Defendant's bowling bag, which was in the backseat of his vehicle. *Id.* Officers observed a ceiling panel that was broken and hanging down in the women's restroom and a ceiling panel that "had been pushed back up over the rest of the panels" in the men's restroom, revealing an "opening

in the ceiling." *Id.* at *4.  Fingerprints from the door facing and exhaust fan cover in the men's restroom matched the Defendant's.  *Id.* at *6.

### C.     TRIAL AND POST-TRIAL PROCEEDINGS

In June 1996, the Defendant proceeded to trial on four counts of felony murder and one count of especially aggravated robbery.  He presented evidence at trial that he did not attend the party at the trailer park before the offenses, that another witness saw a Caucasian man who did not appear to be an employee inside Taco Bell around the time that the offenses occurred, and that the State had entered a "charge agreement" with David Housler, which the State later terminated, whereby Mr. Housler agreed to plead guilty to conspiracy to commit the murders of the victims.  *See Matthews*, 2008 WL 2662450, at *8-9.

The jury convicted the Defendant on all counts and sentenced him to life imprisonment without parole for each murder conviction, finding that the crimes were especially heinous, atrocious, or cruel.  *See* Tenn. Code Ann. § 39-13-204(i)(5) (Supp. 1994).  The trial court imposed a sentence of twenty-five years for the robbery conviction and ordered that the sentences be served consecutively.  *Matthews*, 2008 WL 2662450, at *9.  The Defendant filed a timely motion for a new trial, though it remained unresolved for nearly nine years before being denied in March 2005.  *Id.*  On appeal, his convictions and sentences were affirmed.  *Id.*

In 2013, the trial court clerk's office received a pro se motion from the Defendant inquiring into the status of his pro se petition for post-conviction relief, which he maintained was filed in July 2009.  *Mathews v. State*, No. M2017-01802-CCA-R3-PC, 2019 WL 7212603, at *4 (Tenn. Crim. App. Dec. 27, 2019), *no perm. app. filed*.  Following a hearing, the post-conviction court stayed the post-conviction proceedings and granted the Defendant a delayed appeal to the Tennessee Supreme Court.  The supreme court denied review in 2015.  *Id.*

Once post-conviction proceedings resumed, the Defendant filed multiple amended post-conviction petitions alleging ineffective assistance of counsel and judicial incompetence to sit as thirteenth juror.  *Id.*  The post-conviction court denied these petitions on August 7, 2017.

On appeal, this court found that trial counsel had "entirely failed to subject the prosecution's case to meaningful adversarial testing in the post-trial phase," citing several egregious deficiencies.  *Id.* at *25-27.  We remanded the case to permit the Defendant to file a delayed motion for a new trial with conflict-free counsel but otherwise rejected his claim that the trial judge was incompetent to sit as thirteenth juror.  *Id.* at *27.

On remand, the Defendant filed a pro se amended motion for a new trial in June 2020 raising approximately thirty-five issues. The trial court appointed counsel to represent the Defendant, after which the Defendant sought and was granted multiple continuances of the motion for a new trial hearing. A hearing was scheduled for May 9, 2022, but the Defendant sought another continuance. During the May 9, 2022, hearing, the trial court denied the Defendant's request for a continuance and proceeded with the motion for a new trial hearing. The Defendant testified that he had prepared a second pro se amended motion for a new trial, which was entered as an exhibit, and he testified regarding each issue raised and the basis for his claims. Following the hearing, the trial court issued a detailed order denying the Defendant's motion for a new trial.

The Defendant filed a timely notice of appeal and elected to proceed pro se on appeal.

## ANALYSIS

On appeal, the Defendant raises twelve issues for our review. Separating these issues into broad categories, we note that the Defendant first challenges his conviction for especially aggravated robbery, including that the evidence is legally insufficient to support the conviction, the indictment was duplicitous, and the State filed to make a proper election of offenses. Next, the Defendant raises two alleged trial errors challenging the admission into evidence of a black denim jacket and the State's failure to correct false testimony. In addition, he asserts error in the jury's instruction and deliberations, including challenges to the trial court's failure to grant a mistrial based on an impermissible outside influence on the jury; the trial court's refusal to allow additional closing arguments after it gave a supplemental jury instruction on criminal responsibility during jury deliberations; the trial court's failure to issue an enhanced identification jury instruction; and the trial court's jury instruction on the reliability of fingerprint evidence. The Defendant also asserts error in his sentencing, contending that the State's reliance on the especially heinous, atrocious, or cruel aggravating circumstance during his hearing, while claiming that the aggravating circumstance could not be supported during the co-defendant's subsequent trial, was improper. Further, he argues that the trial judge's failure to recuse himself from the trial and post-trial proceedings was in error. And finally, the Defendant maintains that the cumulative effect of the errors entitles him to a new trial.

We address each of these issues in turn.

## A. ESPECIALLY AGGRAVATED ROBBERY CONVICTION

The count in the indictment charging the Defendant with especially aggravated robbery alleged that he

> unlawfully, knowingly and violently did use deadly weapons, to-wit: 9 mm pistol and 12 ga. Shotgun, to take approximately $1,527.66 from the persons of Kevin Campbell, Angela Wyatt, Patricia Price and Marsha Klopp, which said monies were owned by Taco Bell, Inc. but in possession of said victims, as a result of which said victims suffered serious bodily injury, to-wit: death, and by the use of said deadly weapons, to-wit: 9 mm pistol and 12 ga. Shotgun, did take from the persons of said victims property of a value of over $1,000.00 in violation of TCA 39-13-403 and against the peace and dignity of the State of Tennessee.

Before trial, the indictment was amended to increase the amount of money taken to $2,968.78, to change "12 ga. shotgun" to "12 gauge shotgun," and to insert the word "feloniously" after "unlawfully."

Relying on the language in the indictment, the Defendant argues that the evidence is legally insufficient to support his conviction of especially aggravated robbery, that the indictment is duplicitous, and that the State failed to properly elect the offenses upon which the conviction is based. The State responds that the evidence is sufficient to support the especially aggravated robbery conviction, that the Defendant waived his challenges to the indictment and the State's failure to elect, and that the Defendant failed to otherwise establish plain error. We agree with the State.

### 1. Legal Sufficiency of the Evidence

#### a. Standard of Appellate Review

"The standard for appellate review of a claim challenging the sufficiency of the State's evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard of review is "highly deferential" in favor of the jury's verdict. *See State v. Lyons*, 669 S.W.3d 775, 791 (Tenn. 2023). Indeed, "[w]hen making that determination, the prosecution is afforded the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences

which may be drawn therefrom." *State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citation and internal quotation marks omitted). To that end, "[w]e do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury, as the trier of fact." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (citations omitted). "The standard of review is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citation and internal quotation marks omitted).

### b.      Especially Aggravated Robbery

Especially aggravated robbery is defined as a robbery that is "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a) (1991). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a) (1991). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103 (1991).

The Defendant contends that based on the language in the indictment, the State was required to establish that the money was taken "from the person" of all four victims. He argues that although the evidence established that Ms. Klopp, as the closing manager, had constructive possession of the money, the evidence failed to establish that the other three victims also had constructive possession of the money. The State responds that the Defendant failed to cite to any authority supporting his claim that the State was required to prove that the money was taken from the persons of all four victims but that regardless, the evidence established that the victims were in constructive possession of the money. We agree with the State that the evidence is sufficient to sustain the conviction.

"A robbery can involve the taking of property from the physical body of a person, in which a person has actual possession of the property, or from a person's immediate presence or the general area in which the victim is located, in which the person has constructive possession of the property." *State v. Tolbert*, 507 S.W.3d 197, 217 (Tenn. Crim. App. 2016) (citations omitted). Our supreme court "has long construed the term 'from the person of another' to include both the theft of an object held by the victim or carried on the victim's body and the theft of an object from the victim's presence." *State v. Edmondson*, 231 S.W.3d 925, 928-29 (Tenn. 2007) (citing *Morgan v. State*, 415 S.W.2d 879, 881 (Tenn. 1967) ("It is actual when the [theft] is immediately from the person; and constructive when in the possession or in the presence of the party robbed.")); *State v. Nix*, 922 S.W.2d 894, 901 (Tenn. Crim. App. 1995) (recognizing that robbery is committed

- 7 -

when the offender, acting with the requisite intent, carries the property away "from the victim's presence")).

"Constructive possession requires that a person knowingly have the power and the intention at a given time to exercise dominion and control over an object, either directly or through others. In essence, constructive possession is the ability to reduce an object to actual possession." *State v. Copeland*, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984). "The mere presence of a person in an area where [an object is] discovered is not, alone, sufficient to support a finding that the person possessed the [object]." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, a victim may constructively possess property even if the property is located in another room. *See, e.g., Jones v. State*, 383 S.W.2d 20, 24 (Tenn. 1964) (concluding that the theft of items while the victim was restrained in another room constituted robbery); *State v. Edwards*, 868 S.W.2d 682, 700 (Tenn. Crim. App. 1993) (upholding the defendant's robbery conviction when the defendant assaulted the victim and ordered her to go into her bathroom, and took money from the victim's wallet that was in her living room).

Tennessee courts have repeatedly recognized that an employee who was on duty at a business at the time of a robbery had constructive possession of the property taken from the business. In *Jones v. State*, our supreme court affirmed a conviction for armed robbery of a business security guard when the perpetrators confronted the guard while armed with guns, bound him to a stool, opened a safe located in another room, and took money from the safe before fleeing. *Jones*, 383 S.W.2d at 21. Our supreme court rejected the defendant's arguments that the property was not taken from the guard's person and that the guard did not own the property taken. *Id*. at 22-24. The court reasoned that the security guard was "an agent, employee and custodian of the property taken while he was on duty." *Id.* at 24; *see also State v. Minter*, No. W2015-00540-CCA-R3-CD, 2016 WL 520653, at *4 (Tenn. Crim. App. Feb. 8, 2016), *perm. app. denied* (Tenn. June 24, 2016) (recognizing that "a store clerk operating a cash register may be considered as the 'owner' of property for the purposes of aggravated robbery"); *State v. Parker*, No. M2001-00773-CCA-R3-CD, 2002 WL 31852850, at *2 (Tenn. Crim. App. Dec. 18, 2002), *perm. app. denied* (Tenn. May 5, 2003) (upholding the defendant's conviction of aggravated robbery of a pawn shop where the pawn shop employees were "owners," who "were in lawful possession of the guns that the defendant removed from the shop at gunpoint"); *State v. Singleton*, 1987 WL 16381, at *2 (Tenn. Crim. App. Sept. 2, 1987) (concluding that an employee on duty at a store had constructive possession of money taken during an armed robbery); *Moorman*, 577 S.W.2d at 475 (determining that a "pharmacist intern" on duty at a pharmacy was in constructive possession of cash and drugs taken during an armed robbery). Similar to our supreme court's opinion in *Jones*, other jurisdictions have upheld robbery convictions when the property was taken by force or fear from the property owner's employee, who had no ownership interest and was not in "immediate physical control of the property."

These jurisdictions have reasoned that "employees are custodians of the property on the business premises for the benefit of the owner/employer and therefore are deemed to be in constructive possession." *E.g.*, *State v. Behrens*, 61 P.3d 636, 638-39 (Idaho 2003) (citing cases).

In this case, the victims were employees of Taco Bell, and, as such, they constructively possessed the money and had a greater right of possession as against anyone attempting to steal it, including the Defendant. *See State v. Harrell*, No. E2005-01531-CCA-R3-CD, 2007 WL 595885, at *12 (Tenn. Crim. App. Feb. 26, 2007) (examining whether the victim had a greater right to possession of a truck taken than the defendant in analyzing the sufficiency of the evidence supporting the defendant's conviction of especially aggravated robbery), *perm. app. denied* (Tenn. June 25, 2007); *State v. Bush*, No. M2002-02390-CCA-R3-CD, 2004 WL 794755, at *7 (Tenn. Crim. App. Apr. 14, 2004) (noting that although the victim did not own the items taken, he had a greater right to their possession than the defendant), *perm. app. denied* (Tenn. Oct. 4, 2004). The Defendant's murder of the victims prevented them from safeguarding the money and retaining possession for their employer. We conclude that the evidence established that the victims had constructive possession of the money taken by the Defendant and that, therefore, the money was taken "from the person" of the victims. The evidence is sufficient to support the Defendant's conviction for especially aggravated robbery.

## 2. Duplicity

The Defendant asserts that the indictment charging especially aggravated robbery is duplicitous in that it charged four separate offenses in the same count. According to the Defendant, the indictment charged four separate takings of property possessed by four separate victims. The State responds that the Defendant has waived the issue by failing to challenge the indictment before trial and that the Defendant is not entitled to relief under plain error review because the indictment charged one taking from four victims.

As noted by the State, the Defendant failed to raise this issue before trial. Challenges to duplicitous indictments must be raised prior to trial. *State v. Jones*, 589 S.W.3d 747, 757 (Tenn. 2019); *State v. Lindsey*, 208 S.W.3d 432, 439 (Tenn. Crim. App. 2006); *see* Tenn. R. Crim. P. 12(b). "[T]his court has concluded that failure to allege a duplicitous indictment before the trial results in waiver of appellate review." *State v. Lee*, No. E2017-00368-CCA-R3-CD, 2018 WL 934534, at *4 (Tenn. Crim. App. Feb. 16, 2018), *perm. app. denied* (Tenn. June 6, 2018) (citations omitted).

Because the Defendant failed to raise this issue before trial, he has waived plenary review and may obtain relief, if at all, pursuant to the plain error doctrine. *See State v.*

*Dotson*, 450 S.W.3d 1, 54 (Tenn. 2014). However, our supreme court has cautioned that our discretionary authority to review unpreserved issues for plain error must be "sparingly exercised." *See State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007). In this case, we respectfully decline to exercise that discretion for two reasons.

First, in his principal brief, the Defendant did not request that we conduct plain error review, and he did not argue or analyze any of the factors that could justify plain error relief. *State v. Enix*, 653 S.W.3d 692, 701 (Tenn. 2022) (setting forth criteria for plain error review). "To be clear, a party seeking plain error relief must generally raise and argue the issue in the party's briefing, just as the party would do with all other issues in the ordinary course of an appeal." *State v. Funk*, No. E2022-01367-CCA-R3-CD, 2023 WL 7130289, at *3 (Tenn. Crim. App. Oct. 30, 2023) (citing Tenn. R. App. P. 27(a)), *no perm. app. filed*. Because the Defendant bears the burden of showing an entitlement to plain error relief, his failure to request this relief necessarily weighs against any such consideration on our own. *See State v. Cornwell*, No. E2011-00248-CCA-R3-CD, 2012 WL 5304149, at *18 (Tenn. Crim. App. October 25, 2012), *perm. app. denied* (Tenn. Mar. 5, 2013).

Second, and more importantly, the State specifically argued in its response brief that the Defendant waived the issue by failing to raise it before trial. Despite being notified that his issue may be waived because the issue was not presented and preserved in the trial court, the Defendant failed to respond to this argument or otherwise request plain error review in his reply brief. "Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error relief." *State v. Thompson*, No. W2022-1535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023), *no perm. app. filed*; *State v. Powell*, No. W2011-002685-CCA-R3-CD, 2013 WL 12185202, at *8 (Tenn. Crim. App. Apr. 26, 2013), *perm. app. denied* (Tenn. Sept. 11, 2013). Because no "particularly compelling or egregious circumstances" exist here, we respectfully decline to consider plain error relief on our own.

### 3.       Election of Offenses

The Defendant argues that proof was introduced at trial of four separate "takings" of cash from four separate victims, thus establishing four especially aggravated robbery offenses. He also asserts that proof was introduced of two separate robberies directed at Ms. Klopp, one involving the taking of money and the other involving the taking of her keys. The Defendant maintains that the State's failure to elect the offense upon which it was relying in seeking a conviction for especially aggravated robbery violated his constitutional right to a unanimous jury verdict. The State responds that the Defendant has

waived the issue and has otherwise failed to establish that he is entitled to relief under plain error review.

When the evidence received at trial indicates that the defendant has committed more offenses against the victim than were charged in the indictment, the State must elect the facts upon which it intends to rely for each count of the indictment in order to protect "the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001); *see also State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The election doctrine refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt." *State v. Qualls*, 482 S.W.3d 1, 9 (Tenn. 2016).

The State argues that the Defendant waived this argument issue by failing to raise it before the trial court. As an appellate court, our authority to decide cases generally extends only to those issues that have been "formulated and passed upon in some inferior tribunal." *State v. Bristol*, 654 S.W.3d 917, 925 (Tenn. 2022) (citation and internal quotation marks omitted). This is not a new requirement; "[i]t has long been the general rule that questions not raised in the trial court will not be entertained on appeal." *Id.* (quoting *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983)). And indeed, "[t]his obligation to preserve issues applies to constitutional issues as well as non-constitutional ones." *State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020).

We have recognized an important corollary to these principles. Just as a party cannot raise a new issue for the first time on appeal, the party on appeal generally may not support its claim by relying on different grounds or arguments:

An appellant cannot raise an issue for the first time on appeal nor can they change their arguments on appeal. In other words, a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason on appeal.

*State v. Hardison*, 680 S.W.3d 282, 309 (Tenn. Crim. App. 2023) (citation and internal quotation marks omitted). Of course, we must "review the record carefully to determine whether a party is raising an issue for the first time on appeal," being mindful not to "exalt form over substance." *See State v. Reynolds*, 635 S.W.3d 893, 926-27 (Tenn. 2021) (citation and internal quotation marks omitted).

In this case, the Defendant raised the election issue in his amended motion for a new trial on remand. However, his argument was limited to whether an election was required in light of proof that cash and Ms. Klopp's keys were taken. The Defendant did not argue in his motion for a new trial that proof of four separate "takings" of cash from four separate victims was introduced at trial, thus requiring an election by the State.

As an intermediate appellate court, our principal function is to review and correct errors. *State v. Phifer*, No. M2013-01401-CCA-R3-CD, 2014 WL 4698499, at *16 (Tenn. Crim. App. Sept. 23, 2014), *no perm. app. filed*. In essence, the Defendant wishes to have us place the trial court in error on an argument that it was never asked to consider in the first place. Because doing so would undermine the values that our issue-preservation requirements seek to preserve, *see Bristol*, 654 S.W.3d 915-26, we respectfully decline the invitation. *See State v. Kennedy*, No. M2013-02207-CCA-R9-CD, 2014 WL 4953586, at *10 (Tenn. Crim. App. Oct. 3, 2014) (recognizing that by failing "to present this argument in the trial court, the trial court did not have the opportunity to pass on it, and we will not consider it."), *no perm. app. filed*. As such, we conclude that the Defendant has waived plenary review of the issue of election by failing to raise it at trial. *See* Tenn. R. App. P. 3(e); *State v. Knowles*, 470 S.W.3d 416, 425 (Tenn. 2015).

As with his duplicity argument, the Defendant again did not request that we conduct plain error review and did not analyze any of the factors that could justify plain error review, even after the State argued waiver in its response brief. No "particularly compelling or egregious circumstances" exists to justify our sua sponte consideration of plain error relief. *See Thompson*, 2023 WL 4552193, at *5; *Powell*, 2013 WL 12185202, at *8. Accordingly, we respectfully decline to consider plain error relief on our own.

## B.    ADMISSION OF THE BLACK JACKET

The Defendant next challenges the admission of the black denim jacket as an exhibit at trial. The State responds that the Defendant has waived this issue by failing to support the issue with argument or to otherwise cite to authority.

We agree with the State that the Defendant has fallen short of his obligations as an appellant. As noted above, our principal function is to review and correct errors. *Phifer*, 2014 WL 4698499, at *16. Properly conceived, our role is not to "sit as self-directed boards of legal inquiry and research, sallying forth each day looking for wrongs to right." *Bristol*, 654 S.W.3d at 924 (citations and alteration omitted). Instead, we rely upon the parties to identify the errors *they* believe were committed in the trial court and to show why *they* believe the law entitles them to relief on appeal. *See Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011) (stating that the appellant should identify "those issues most

amenable to success on appeal and present those issues to the court supported by citation to authorities and appropriate references to the record").

To that end, "simply raising an issue is not sufficient to preserve it for appellate review." *State v. Gooch*, No. M2022-01395-CCA-R3-CD, 2024 WL 2814624, at *4 n.4 (Tenn. Crim. App. June 3, 2024), *perm. app. filed* (Tenn. Aug, 7, 2024). Instead, Tennessee Rule of Appellate Procedure 27(a)(7)(A) requires the appellant to set forth the contentions "with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on[.]" Reinforcing this requirement, Rule 10(b) of the rules of this court cautions that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." *See also State v. Molthan*, No. M2021-01108-CCA-R3-CD, 2022 WL 17245128, at *2 (Tenn. Crim. App. Nov. 28, 2022) (finding waiver when the defendant did not "make any argument in support of this issue in his brief" and did not "cite to any authorities or appropriate references in the record"), *no perm. app. filed*.

The Defendant alleged in his amended motion for a new trial that the State failed to establish the chain of custody of the black denim jacket that was admitted at trial. The trial court found in its order denying the amended motion for a new trial that the State established the chain of custody for the jacket and that any error in admitting the jacket was harmless. In his principal brief, the Defendant does not challenge the trial court's conclusion that the chain of custody was established but, instead, maintains that the trial court "erred when it concluded that any error in admitting the [b]lack [d]enim jacket was harmless." His brief on the issue, which consists of one page in which he quoted a portion of the trial court's ruling and a one-sentence claim that the trial court erred in finding that any error in the admission of the jacket was harmless, falls short of the requirements set forth in Rule 27 of the Tennessee Rules of Appellate Procedure. The Defendant filed a reply brief in which he cites two opinions from our supreme court and appears to challenge for the first time the trial court's finding that the chain of custody was established, arguing that "the missing link in [his] case that rendered the jacket inadmissible[ ] involved more than a functionary duty, such as transposing the letters on a typed up evidence receipt or some other clerical non-relevant error." However, the Defendant fails to identify the "missing link," which he claims rendered the jacket "inadmissible."

In essence, to address the Defendant's concerns, we must first construct developed arguments from his conclusory statements and make assumptions about the extent of his requests for relief. Next, we must examine the already extensive record for testimony, evidence, and information relevant to those arguments. We must then address and resolve those arguments in the context of the applicable law and proper standards of appellate review. Our role as an error correction court does not include—and perhaps does not even

permit—our undertaking the efforts required by the Defendant's submission. *See City of Memphis v. Edwards by & Through Edwards*, No. W2022-00087-SC-R11-CV, 2023 WL 4414598, at *2 (Tenn. July 5, 2023) ("[D]ecades of caselaw and the very foundations of our adversarial justice system dictate that courts cannot and should not shoulder the burden of fashioning the arguments of the parties who have chosen not to do so for themselves." (citation omitted)). After all, the parties generally "know what is best for them and are responsible for advancing the facts and argument entitling them to relief." *State v. Manning*, No. E2022-01715-CCA-R3-CD, 2023 WL 7439203, at *5 (Tenn. Crim. App. Nov. 9, 2023) (citation omitted), *perm. app. denied* (Tenn. May 16, 2024). Because the Defendant's brief does not comply with Tennessee Rule of Appellate Procedure 27(a)(7), we must conclude, regretfully but respectfully, that he has waived appellate consideration of the issues raised. *See State v. Moss*, No. E2022-01227-CCA-R3-CD, 2023 WL 5702902, at *5 (Tenn. Crim. App. Sept. 5, 2023), *no perm. app. filed*.

## C.   FAILURE TO CORRECT FALSE TESTIMONY

The Defendant asserts that Charles Bush, a former assistant district attorney general, falsely testified at trial that the State never had any evidence placing the co-defendant inside Taco Bell at the time of the offenses. The Defendant maintains that the State failed to correct the false testimony and improperly relied upon the false testimony during closing arguments. The State responds that the Defendant waived the issue by failing to object at trial and that he has failed to establish plain error.

The Defendant relies upon the statements of various inmates to police regarding their conversations with the co-defendant while housed together in jail to support his claim that the testimony was false. In November 1995, Charlie Brown told TBI agents that while he was housed with the co-defendant in jail in January 1994, the co-defendant acknowledged that he and the Defendant were "both in on" the commission of the offenses. In April 1996, Larry Underhill informed the Tennessee Bureau of Investigation ("TBI") agents that while incarcerated with the co-defendant in late November or early December of 1995, the co-defendant told Mr. Underhill that he was with the Defendant at Taco Bell and that he shot and killed the victims when the Defendant was unable to do so. The Defendant also asserts that Michael Miller made a statement to the police implicating the co-defendant in the offenses.

However, during the prior post-conviction proceedings, the Defendant's lead trial counsel testified that the State provided him with Mr. Underhill's statement before the trial. The trial transcript also reflects that the parties discussed Mr. Brown's statement before General Bush testified and that trial counsel acknowledged having received and reviewed Mr. Brown's statement.

- 14 -

Thus, the Defendant had the information necessary to object at trial to General Bush's testimony and the State's reliance on General Bush's testimony during closing arguments, but the Defendant failed to do so. "Ordinarily, before a party can challenge the admission of evidence on appeal, the party must have preserved the issue in the trial court. To preserve an issue, the party should first assert a timely objection identifying a specific ground." *Thompson*, 2023 WL 4552193, at *3. Indeed, we have been "extremely hesitant to put a trial court in error where its alleged shortcoming has not been the subject of a contemporaneous objection." *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Because the Defendant failed to object while having a known basis to do so, we conclude that he has waived this issue by failing to preserve it in the trial court. *See* Tenn. R. App. P. 36(a); *see also State v. Hall*, 976 S.W.2d 121, 149 (Tenn. 1998) (appendix) (concluding that the defendants waived the claim that the State failed to reveal that a witness was untruthful because the defendants "had an opportunity to correct any error" and failed to do so); *State v. Onyiego*, No. W2017-00217-CCA-R3-CD, 2018 WL 2175819, at *8-9 (Tenn. Crim. App. May 10, 2018) (holding that the defendant waived his claim that the State made "patently false" statements during closing arguments by failing to object to the statements), *perm. app. denied* (Tenn. Aug. 8, 2018).

The Defendant did not request that we conduct plain error review and did not analyze any of the factors that could justify plain error review, even after the State argued waiver in its response brief. We conclude that no "particularly compelling or egregious circumstances" justifying our sua sponte consideration of plain error relief exists. *See Thompson*, 2023 WL 4552193, at *5; *Powell*, 2013 WL 12185202, at *8. Accordingly, we respectfully decline to consider plain error relief on our own.

### D.     IMPERMISSIBLE OUTSIDE INFLUENCE

The Defendant next challenges the trial court's refusal to grant a mistrial, arguing that using a camera with a live video feed in the courtroom where the jury reviewed exhibits during deliberations was improper. He argues that the video camera was an improper external influence on the deliberative process and that the State failed to rebut the presumption of prejudice. He also asserts that the trial court failed to question the jurors to determine the extent to which the moving of the video camera had "a chilling effect or constituted an impermissible outside influence on the juror's personal state of mind."[4] The State notes that this court held in the Defendant's initial direct appeal that the Defendant failed to show that the camera interfered with the jury's deliberative process. The State argues that the Defendant presented no new evidence during the hearing on his amended

---

[4] We address the Defendant's claim that the trial judge was a material witness and should have recused himself along with the Defendant's other arguments regarding the recusal of the trial judge later in this opinion.

motion for a new trial to establish that this court's prior decision was incorrect. We agree with the State.

Due to the large number of trial exhibits, the trial court allowed the jury to use the courtroom during deliberations. *See Matthews*, 2008 WL 2662450, at *12. In the courtroom, a mounted camera provided a live video feed for the media. Although the court ordered that this camera be pointed at the state seal during deliberations, it later learned that the camera had been moved and was pointing at a different image. *Id.* The Defendant moved for a mistrial, asserting that the video camera's recording images in the courtroom during jury deliberations resulted in "prejudice to the judicial process." *Id.* The trial court conducted an evidentiary hearing outside the jury's presence, during which several members of the media testified. *Id.*

According to the evidence presented at the hearing, the courtroom camera was focused on the wall above the trial judge's chair during jury deliberations from approximately 9:30 a.m. until about 3:00 p.m. *Id.* The camera fed the image without sound to the courthouse media room and at least two media trucks outside. *Id.* At some point, and in response to members of the media questioning whether trial proceedings had resumed, the camera operator used a control device from the media room to lower the camera's focal point to the trial judge's chair to determine whether the judge had returned to the courtroom. *Id.* No one testified to observing any jurors, exhibits, or movement on the monitor, and the parties did not present any evidence indicating that anyone who may have been in the courtroom was aware that the camera was moved. *Id.* After the hearing, the trial court denied the Defendant's motion for a mistrial, finding that the proof did not establish that the media's action "actually intruded into the deliberative function of the jury." *Id.*

On appeal, this court determined that the record supported the trial court's finding that no intrusion occurred. *Id.* We reasoned that "[n]o evidence established that any member of the jury was even aware of the incident" and that "[t]he evidence did not show that camera movements within the courtroom during deliberation impaired the jurors' ability to decide the case only on the evidence or that the trial was adversely affected by the impact of media coverage on one or more of the participants." *Id.* (citations omitted).

Despite having the opportunity to do so on remand, the Defendant presented no new evidence suggesting that our original holding was incorrect. Accordingly, for the reasons we gave in our previous opinion, the Defendant is not entitled to relief regarding this issue.

### E.   CRIMINAL RESPONSIBILITY INSTRUCTION

The Defendant challenges the trial court's sua sponte decision to issue an instruction on criminal responsibility to the jury after deliberations began. He asserts that the trial court erred in issuing the instruction while denying the Defendant's request to present an additional argument to the jury based on the instruction. The Defendant also asserts that the instruction confused the jury and that the trial court's response to the jury's questions failed to alleviate the confusion. The State responds that this court previously upheld the trial court's instruction and that the Defendant is not otherwise entitled to relief.

### 1.   Background

During closing arguments, the State reviewed the evidence and maintained that the evidence established that the Defendant committed the robbery and the murders. The State twice argued that the Defendant "is the shooter, the killer of one son and three daughters of Clarksville. Or is a killer, a first-degree killer" and that "[t]he State's theory in this case is that he is the shooter or a shooter." The Defendant objected on both occasions, and the trial court sustained the objections, instructed the jury to disregard the State's remarks, and told the State to keep the remarks within the evidence produced at trial and the reasonable inferences drawn from the evidence. The Defendant subsequently moved for a mistrial, arguing that the State suggested to the jury twice "that there are available to them two possible theories upon which they can convict in this case, knowing that he had been warned about that before." The trial court denied the motion.

The next day, the trial court issued the jury instructions but did not include an instruction on criminal responsibility. The jury began its deliberations at 9:45 a.m. At some point while the jury was on its lunch break, the trial court announced that it had "inadvertently omitted" an instruction on criminal responsibility and that it intended to call the jury back into the courtroom and issue the supplemental instruction. The Defendant objected, arguing that no evidence had been presented to allow the jury to find that he was criminally responsible for the conduct of another. The trial court overruled the Defendant's objection and issued the instruction. The trial court informed the jurors that the court had inadvertently omitted the instruction, that they were not to place "undue emphasis" on the supplemental instruction, and that they should consider the instruction "in light of and in harmony with" the other instructions.

During a hearing outside the jury's presence, the Defendant objected to the instruction, arguing that it supported the State's closing argument, which presented two alternative theories of guilt. He requested that the trial court reopen closing arguments so he could address the issue of criminal responsibility to the jury. He argued that he deserved

a chance to adjust his argument because the court's decision to issue a criminal responsibility instruction, after rejecting the State's attempts to introduce the theory during closing arguments, effectively endorsed the State's theory. The trial court denied his request, noting that the State had not presented any evidence of the co-defendant's involvement and that the Defendant himself had introduced the evidence that led to the criminal responsibility instruction.

On the following day at approximately 11:00 or 11:15 a.m., the jury submitted two questions to the trial court: (1) "Would you clarify Supplemental Instruction Number 2 [the criminal responsibility instruction]?" and (2) "Would you clarify all of Count Five [especially aggravated robbery]?" The trial court indicated that it had prepared a response, and both parties stated that they did not object to the response. After that, the trial court instructed the jury that any additional explanation regarding the supplemental instruction and count five of the indictment would be inappropriate. The trial court also instructed the jury against placing undue emphasis on the supplemental instruction. The jury continued its deliberations, and later that same day, the jury returned a verdict convicting the Defendant of the offenses as charged.

We addressed this issue on direct appeal. We determined that because the Defendant raised the issue of criminal responsibility, he could not be "heard to complain" about the jury being instructed on the issue. *Matthews*, 2008 WL 2662450, at *18 (citing Tenn. R. App. P. 36(a)). We also recognized that the jury had been deliberating only briefly before the trial court issued the instruction, that the trial court informed the jury that the court inadvertently omitted the instruction, and that the trial court warned the jury against placing any undue emphasis on the instruction. *Id.* The Defendant's present appeal raises no new facts or authorities suggesting that our original disposition was in error. As such, we conclude that the Defendant is not entitled to relief on this ground.

## 2. Denial of Additional Closing Arguments

The Defendant further asserts that, in light of the timing of the instruction, the trial court erred in denying his request for additional closing argument to explain that criminal responsibility did not apply to his case. He maintains that the trial court's refusal to allow him a supplemental closing argument violated his constitutional right to assistance of counsel.

The Sixth Amendment to the United States Constitution provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Similarly, Article I, Section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused hath the right to be heard by himself

and his counsel." These provisions guarantee criminal defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). "Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." *Strickland*, 466 U.S. at 686 (citations omitted).

In *Herring v. New York*, 422 U.S. 853 (1975), the United States Supreme Court invalidated a New York statute that allowed a judge in a nonjury criminal trial case to deny closing arguments before rendering judgment. In so doing, the Court held that the complete denial of the opportunity to present closing arguments in both jury and nonjury trials violated the defendant's right to assistance of counsel guaranteed by the Sixth and Fourteenth Amendments. *Id.* at 855-59, 863-65. The Court noted that "closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial." *Id.* at 858. The Court emphasized the importance of closing argument, stating:

> It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt.

*Id*. at 862 (citing *In re Winship*, 397 U.S. 358 (1970)).

The Court found no justification for a statute allowing a judge to deny any opportunity for a closing argument. *Id.* at 863. Reviewing the possible arguments the defendant could have made based on the evidence, the Court said, "There is no way to know whether these or any other appropriate arguments in summation might have affected the ultimate judgment in this case." *Id.* at 864. After concluding that the defendant was denied his constitutional right to assistance of counsel, the Court vacated the judgment and remanded the case "for further proceedings not inconsistent with this opinion." *Id*. at 865.

Citing *Herring*, the Defendant asserts that the trial court's refusal to allow supplemental closing arguments to address criminal responsibility was "per se prejudicial" and required "automatic reversal" of his convictions. However, in *Glebe v. Frost*, the United States Supreme Court held that "even assuming that *Herring* established that *complete denial* of summation amounts to structural error, it [does] not clearly establish that the *restriction* of summation also amounts to structural error." *Glebe v. Frost*, 574 U.S.

21, 24 (2014) (emphasis in original).  The Court noted that "*[m]ost* constitutional mistakes call for reversal only if the government cannot demonstrate harmlessness." *Id.* at 23 (citing *Neder v. United States*, 527 U.S. 1, 8 (1999) (emphasis in original)).  "Only the rare type of error—in general, one that 'infect[s] the entire trial process' and 'necessarily render[s] [it] fundamentally unfair'—requires automatic reversal." *Id.* (quoting *Neder*, 527 U.S. at 8) (alteration in original).  The Court stated that "[n]one of our cases clearly requires placing improper restriction of closing argument in this narrow category." *Id.*

Furthermore, the *Herring* Court recognized the trial court's authority to control or restrict argument.  *Herring*, 422 U.S. at 862.  The Court stated that the trial court has "great latitude in controlling the duration and limiting the scope of closing arguments." *Id.*  The trial court "may limit counsel to a reasonable time," "may terminate argument when continuation would be repetitive or redundant," and "may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." *Id.*  The trial court has "broad discretion" in these respects. *Id.*  Thus, even if *Herring* stands for the proposition that the complete denial of closing argument is a structural error, *Herring* is inapposite because the trial court restricted the Defendant's closing argument but did not completely deny him that right. *See Glebe*, 574 U.S. at 24.

Our supreme court, likewise, has recognized the trial court's considerable discretion in controlling closing arguments. *State v. Bush*, 942 S.W.2d 489, 516 (Tenn. 1997). Tennessee Rule of Criminal Procedure 29.1 provides that the State has the right to make the first closing argument, that the defendant is allowed to make a closing argument following the State's argument, and that the State is then allowed to make a final closing argument.  Rule 29.1 also provides that the trial court can grant the parties additional closing arguments as well. *See* Tenn. R. Crim. P. 29.1.[5]  The trial court's decision will not be reversed on appeal absent a showing of an abuse of discretion. *See State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999); *State v. Zinkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995).

Other jurisdictions have recognized that closing arguments need not be reopened following a supplemental jury instruction issued during jury deliberations if the supplemental instruction did not amend or add a new element to the charge and simply clarified an existing theory. *See, e.g.*, *United States v. Slaughter*, 128 F.3d 623, 629 (8th Cir. 1997) (providing that "reargument was not required" where the trial court's instruction in response to a jury question during deliberations "neither amended nor added a new element to the indictment's charge"); *United States v. Fontenot*, 14 F.3d 1364, 1368 (9th

---

[5]     This provision is currently set forth in Tennessee Rule of Criminal Procedure 29.1(d).  Prior to an amendment in 2006, the provision was set forth in Rule 29.1(c).

Cir. 1994) (recognizing that "[a] supplemental instruction which merely clarifies an existing theory does not mandate additional arguments").

However, when a new theory of culpability is presented to the jury in a supplemental instruction following closing arguments, the trial court should generally allow counsel additional closing argument. *See, e.g.*, *Fontenot*, 14 F.3d at 1368 (providing that "if a supplemental jury instruction given in response to a jury's question introduces a new theory to the case, the parties should be given an opportunity to argue the new theory" to prevent unfair prejudice); *United States v. Horton*, 921 F.2d 540, 546 (4th Cir. 1990) (concluding that although the better course would have been for the trial court to have allowed the parties to give additional argument following the issuance of a supplemental instruction on aiding and abetting, no prejudice resulted); *United States v. Gaskins*, 849 F.2d 454, 460 (9th Cir. 1988) (concluding that issuing a supplemental jury instruction on aiding and abetting after the trial court initially declined to issue the instruction and without allowing additional closing arguments to address the theory was prejudicial error).

We conclude that the trial court's supplemental jury instruction in the present case introduced a new theory of culpability and did not serve merely to clarify an existing theory. Criminal responsibility "is an alternative theory under which the State may establish guilt based upon the conduct of another." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). The legislative intent in promulgating the criminal responsibility statute was to "embrace the common law principles governing aiders and abettors and accessories before the fact." *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997). To convict the Defendant of the offenses under a theory of criminal responsibility, the State was not required to establish that he was the principal offender but that he "knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

In some sense, because the Defendant introduced the proof that gave rise to the need for the instruction, he cannot claim surprise when the trial court issues the instruction. However, the record includes no indication of the trial court's intent to instruct on criminal responsibility before the parties presented their closing arguments. During the State's initial closing argument, the State twice made comments suggesting that the Defendant was not the only shooter, which is relevant to the issue of criminal responsibility. The Defendant objected to the comments, and the trial court sustained the objections and instructed the jury to disregard the comments. The State then focused its closing argument on evidence of the defendant's role as the principal offender, and the Defendant argued in his closing that he was not involved in the offenses.

Under these unique circumstances, we respectfully conclude that the parties should have been given the opportunity to present additional closing arguments after the court issued a supplemental instruction on criminal responsibility. *Cf. Gaskins*, 849 F.2d at 459-60 (holding that "instructing the jury that it could convict [the defendant] as an aider or abettor without allowing additional argument to address this theory" was reversible error because the "arguments based on convicting a defendant as a principal or convicting a defendant as an aider and abettor are based on two conceptually different theories," and thus that the theories required the government to prove different elements for each).

### 3.      Harmless Error

Having concluded that the parties should have been permitted to offer additional closing arguments, we must next examine the effect of the error. The Defendant argues that the error is a structural constitutional error that warrants automatic reversal, and the State does not address this issue specifically in its brief.

Although our courts have not had the opportunity to address the standards under which this type of error should be reviewed, we respectfully disagree that it is a structural constitutional error. As we observed above, had the Defendant been denied "absolutely the opportunity for any closing summation at all," he may arguably be entitled to a new trial without a further showing of prejudice. *See Herring*, 422 U.S. at 863. However, the Defendant was not denied the right to make any summation at all. Indeed, his counsel made a lengthy closing argument in which he denied that the Defendant was present at all. At worst, the Defendant's opportunity to make summation was improperly restricted, and the United States Supreme Court has declined to hold that an improper restriction on closing argument is a structural error in the same way that a complete denial of closing argument is. *See Glebe*, 574 U.S. at 23-24 (holding that, "even assuming that *Herring* established that complete denial of summation amounts to structural error, it did not clearly establish that the restriction of summation also amounts to structural error").

The federal courts of appeals generally view this issue through the lens of Federal Rule of Criminal Procedure 30, which requires the district court to "inform counsel of its proposed action upon the requests prior to their arguments to the jury[.]" When a new theory is submitted to the jury following a jury question, the federal courts typically look to whether "the party was unfairly prevented from arguing his or her defense to the jury or was substantially misled in formulating and presenting arguments." *Gaskins*, 849 F.2d at 458; *see also, e.g.*, *United States v. Algee*, 599 F.3d 506, 515 (6th Cir. 2010) ("[C]ircuits that have addressed this issue appear unanimous in holding that the general question is whether the court's failure to rule on requested jury instructions prejudiced or inhibited counsel's ability to argue her theory of the case."). A few of our sister states have held (or

assumed without deciding) that improper restriction on closing argument in this context is a non-structural constitutional error. *See, e.g.*, *Stryker v. State*, 900 S.E.2d 579, 585 (Ga. 2024) (so assuming); *State v. Frost*, 161 P.3d 361, 370 (Wash. 2007) (so holding).

For purposes of our analysis, we assume, without deciding, that a trial court's improper denial of a defendant's opportunity to present a supplemental closing argument after a new theory is submitted to the jury is a non-structural constitutional error. So assuming, the presence of this error requires a new trial unless the State demonstrates "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) (citation and internal quotation marks omitted).

In conducting this analysis, we do not consider "what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* (emphasis in original); *Rodriguez*, 254 S.W.3d at 372 ("An inquiry into harmless error does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. To the contrary, the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making. Where an error more probably than not had a substantial and injurious impact on the jury's decision-making, it is not harmless." (citations omitted)).

As the federal courts have recognized, an important factor in determining prejudice is whether the limitation on closing argument prevented the defendant from making an argument essential to the defense. *See, e.g.*, *United States v. Harris*, 916 F.3d 948, 959 (8th Cir. 1999) (holding that if a trial court limits a defendant's closing argument but "permits a defendant to present the essence of his desired argument to the jury, [the] right to present a complete defense has not been prejudiced"); *Horton*, 921 F.3d at 547 (concluding no "actual prejudice" was shown when the trial court committed a "technical violation" of Federal Rule of Criminal Procedure 30 by issuing a jury instruction on aiding and abetting during jury deliberations where "the factual predicates of [the defendant] as principal and of [the defendant] as aider and abettor are so similar that the arguments to be made against guilt are essentially the same under both theories"); *Gaskins*, 849 F.2d at 460 (holding that the trial court's failure to comply with Rule 30 by issuing a supplemental jury instruction on aiding and abetting without notice to the parties prior to closing arguments and without allowing additional arguments to address the theory was reversible error when the defendant only addressed evidence supporting his role as the principle offender during his closing argument and did not address the theory of aiding and abetting); *see also People v.*

*Mairena*, 144 N.E.3d 340, 350 (N.Y. 2019) (concluding that when the trial court denied a request for a jury instruction but later gave the instruction following the parties' closing arguments, "the relevant question is whether counsel's summation was materially affected in a manner that prejudiced [the] defendant in light of the charge actually given").

Although the Defendant presented evidence at trial giving rise to the criminal responsibility instruction, the Defendant's actual defense theory at trial was that he was not involved in the commission of the offenses, that the co-defendant committed the offenses, and that the co-defendant had no connection to the Defendant in doing so. The Defendant presented evidence suggesting that he was not present at the party during which the co-defendant and others discussed robbing Taco Bell and that a group of Caucasian men was inside the restaurant on the morning of the offenses, which would have excluded the Defendant, who is African American, as the perpetrator. During his closing argument, he attempted to refute the State's evidence placing him inside Taco Bell as the sole perpetrator and made the jury aware of the defense theory that the co-defendant, and not the Defendant, committed the offenses. The Defendant's argument was not that he had a limited role in the offenses but that he was not involved at all. His defense theory was the same regardless of whether the State sought to convict him as the shooter or under a theory of criminal responsibility for the conduct of another. Thus, during closing arguments, the Defendant made all the essential arguments to his defense based on the State's theory that he was the shooter or on a criminal responsibility theory.

The Defendant asserts that during the trial proceedings, the State acknowledged a reasonable probability that the jury would have acquitted him had the trial court not given the supplemental instruction. The Defendant cites an argument made by the State during a pretrial hearing where the State gave three possible scenarios that would come out based on the evidence admitted at trial. We do not view the statements by the State during a pretrial hearing as a concession of reversible error for actions that occurred at trial.

The Defendant also maintains that the jury convicted him based on criminal responsibility for the conduct of another. The jury rendered a general verdict, and the jury was not required to specify whether its verdict was based on the Defendant's own conduct or his criminal responsibility for the conduct of another. *See Lemacks*, 996 S.W.2d at 171 (holding that a general verdict of guilt for driving under the influence that did not specify whether the conviction was based on the defendant's own commission of the offense or on criminal responsibility for the conduct of another did not violate the defendant's right to a unanimous jury verdict).

Nor do we agree with the Defendant that the jury's rejection of the mass murder aggravating circumstance during the penalty phase established that its trial verdict was based on a theory of criminal responsibility. *See* Tenn. Code Ann. § 39-13-204(i)(12). In

*Owens v. State*, this court recognized that the (i)(12) aggravator focuses "on the defendant's own actions or intent and contemplate[s] consideration of the defendant's individual actions." 13 S.W.3d 742, 763 n.13 (Tenn. Crim. App. 1999) (emphasis omitted). The record does not indicate the basis for the jury's rejection of the mass murder aggravator during sentencing, and we decline to speculate what this sentencing consideration meant to the jury's consideration of guilt at trial, particularly given the overwhelming evidence based on the Defendant's own conduct. We conclude that any error by the trial court in denying the Defendant's request to conduct additional closing arguments after it gave the supplemental jury instruction on criminal responsibility was harmless beyond a reasonable doubt.

### 4. Response to Jury Question

The Defendant contends that the jury's question during deliberations demonstrated confusion about criminal responsibility. Citing *Bollenbach v. United States*, 326 U.S. 607 (1946), he further asserts that the trial court should have clarified the meaning of "criminal responsibility" instead of referring the jury back to the original instructions. We respectfully disagree.

Before responding to the jury's question, the trial court specifically asked the Defendant's counsel whether he objected to the proposed response. Counsel responded affirmatively that he had no objection. Generally, "[a] party cannot witness misconduct on the part of the court, await the result of the verdict, and then, if it is against him or her, object to the alleged misconduct." *State v. Burns*, 979 S.W.2d 276, 295 (Tenn. 1998) (appendix) (quoting *State v. Tune*, 872 S.W.2d 922, 930 (Tenn. Crim. App. 1993)). Because the Defendant voiced no disagreement with the trial court's response when asked, he has waived plenary review of this issue on appeal. *See* Tenn. R. App. P. 36(a); *Burns*, 979 S.W.2d at 295 (holding that the defendant waived his challenge to the trial court's response to the jury's question in which the trial court referred the jury back to the instructions previously given when the defendant failed to object to the response at trial). The Defendant is not entitled to relief on this ground.

### F. IDENTIFICATION INSTRUCTION

The Defendant maintained in his amended motion for a new trial that the trial court committed prejudicial error in failing to provide the jury with the enhanced identification instruction set forth in *State v. Dyle*, 899 S.W.2d 607 (Tenn. 1995), an opinion that was issued approximately one year before the Defendant's trial. In its order denying the Defendant's amended motion for a new trial, the trial court determined that it erred in failing to give the *Dyle* instruction but that the error was harmless. On appeal, the

Defendant challenges the trial court's finding that the error was harmless. In response, the State does not challenge the trial court's finding that failing to provide the *Dyle* instruction was error. Instead, the State argues that the Defendant waived his claim on appeal by failing to include argument or cite authority in his brief. *See* Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

The Defendant's brief on the issue consists of one-half page in which he quotes the trial court's findings from the order denying the motion for a new trial and includes one sentence, arguing that Frankie Sanford's testimony identifying the Defendant at Taco Bell before closing as "[o]ne of the most damaging pieces of circumstantial evidence." We agree with the State that the Defendant's brief falls far short of the requirements set forth in Tennessee Rule of Appellate Procedure 27(a) and that the Defendant, therefore, has waived the issue on appeal. *See Moss*, 2023 WL 5702902, at *5. Notwithstanding waiver, we further conclude that the Defendant is not entitled to relief.

In *Dyle*, our supreme court recognized that the accuracy of eyewitness testimony may be affected by the "fallibilities of human sense perception and memory" and that eyewitness testimony "is prone to many outside influences (police interrogations, line-ups, etc.) and is often decisive." *Dyle*, 899 S.W.2d at 612. Our supreme court determined that "the pattern identity instruction traditionally given in Tennessee [was] not adequate in cases where identity is a material issue" and promulgated a more comprehensive jury instruction for those cases in which identity is a material issue. *Id.* The instruction, which was subsequently incorporated into the Tennessee Pattern Jury Instructions, provides:

> One of the issues in this case is the identification of the defendant as the person who committed the crime. The state has the burden of proving identity beyond a reasonable doubt. Identification testimony is an expression of belief or impression by the witness, and its value may depend upon your consideration of several factors. Some of the factors which you may consider are:
>
> (1) The witness' capacity and opportunity to observe the offender. This includes, among other things, the length of time available for observation, the distance from which the witness observed, the lighting, and whether the person who committed the crime was a prior acquaintance of the witness;
>
> (2) The degree of certainty expressed by the witness regarding the identification and the circumstances under which it was made, including whether it is the product of the witness' own recollection;

(3) The occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial; and

(4) The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.

Again, the state has the burden of proving every element of the crime charged, and this burden specifically includes the identity of the defendant as the person who committed the crime for which he or she is on trial. If after considering the identification testimony in light of all the proof you have a reasonable doubt that the defendant is the person who committed the crime, you must find the defendant not guilty.

*Id.*

When identification is a material issue, the trial court must give this instruction if the Defendant requests it. *Id.* Identity is a material issue "when the defendant puts it at issue or the eyewitness testimony is uncorroborated by circumstantial evidence." *Id.* at 612 n.4. A trial court's failure to give the instruction under these circumstances is "plain error." *Id.* at 612. If identification is a material issue, but the Defendant does not request the instruction, the failure to give the instruction will be reviewable under a harmless error standard. *Id.*

In its order denying the Defendant's amended motion for a new trial, the trial court found that identity was a material issue based on the Defendant's cross-examination of Frankie Sanford at trial. Mr. Sanford testified on direct examination that he and a friend placed an order through the drive-thru of Taco Bell at approximately 1:30 a.m. on January 30, 1994. Mr. Sanford paid Mr. Campbell, with whom Mr. Sanford was acquainted. Mr. Sanford testified that as he spoke with Mr. Campbell, he saw four other employees, three females and one male, inside the restaurant. Mr. Sanford identified the Defendant at trial as the male employee. Mr. Sanford described the man as a short, stocky African American man who had sideburns and was wearing a Taco Bell uniform and hat.

The Defendant thoroughly questioned Mr. Sanford during cross-examination to challenge his identification. Mr. Sanford testified that he and the man "made eye contact that night. He looked right at me and I looked right at him. I didn't know who he was, but then I saw him on TV and I heard his name was Courtney Mathews." Mr. Sanford stated

that he saw the Defendant on television following his arrest and recognized him as the same man who was at Taco Bell. Mr. Sanford believed he had contacted the police before viewing the television coverage. He went to the police station where an officer showed him a single photograph of the Defendant. Mr. Sanford testified that the Defendant's sideburns "caught his eye," but he agreed that he could not see the Defendant's sideburns in the photograph shown to him by the police officer. Mr. Sanford was unable to describe the three female employees at Taco Bell apart from their race.

During closing arguments, the Defendant argued that Mr. Sanford's identification was unreliable, but the Defendant did not request the enhanced identification instruction set forth in *Dyle*. Because the Defendant did not request the instruction, we must determine whether the trial court's failure to give the instruction was harmless under the standard now set forth in Tennessee Rule of Appellate Procedure 36(b). Accordingly, the Defendant has the burden of demonstrating that "the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *Rodriguez*, 254 S.W.3d at 372 (quoting Tenn. R. App. P. 36(b)).

At trial, the Defendant cross-examined Mr. Sanford extensively on the reliability of his identification. The Defendant also explored many of the same factors set forth in the *Dyle* instruction when arguing to the jury that Mr. Sanford's identification was unreliable. Furthermore, as noted by the trial court, Mr. Sanford's identification "was far from the only evidence connecting [the Defendant] to these offenses." Other evidence establishing the Defendant's identity as the perpetrator included his discussion at a party of his plans to commit the robbery, his confession to Mr. Ward that he killed four people, his seeking information before the offenses regarding the means of accessing a safe by shooting the dial with a shotgun, his possession just before the offense of the handgun used to kill the victims and the shotgun used to shoot the safe's dial, the recovery of the shotgun from the back of the Defendant's residence, his knowledge of details of the offenses only known to law enforcement officers, and his possession of a large sum of cash following the offenses even though he had been experiencing financial difficulties before the offenses. Given the overwhelming evidence establishing the Defendant's identity as the perpetrator, we conclude that the trial court's failure to issue the enhanced identification instruction was harmless. The Defendant is not entitled to relief on these grounds.

### G. FINGERPRINT INSTRUCTION

The Defendant asserts that the trial court improperly instructed the jury that no two sets of fingerprints are alike. He relies upon this court's opinion in *Rutherford v. State* in which this court held that "the trial court's instruction to the jury that no two sets of fingerprints are alike is a statement of fact that improperly intrudes upon the province of

the jury." *Rutherford v. State*, No. E1999-00932-CCA-R3-PC, 2000 WL 246411, at *15 (Tenn. Crim. App. Mar. 6, 2000) (citing Tenn. Const., art. VI, § 9), *perm. app. denied* (Tenn. Sept. 18, 2000). He maintains that the instruction was reversible error. The State responds that the Defendant waived the issue due to inadequate briefing and that he is not otherwise entitled to relief.

Although the Defendant asserts that the trial court gave an erroneous jury instruction, we do not see in the record the instruction actually given by the trial court. The Defendant failed to include the language of the instruction in his brief, and he failed to cite the trial record where the trial court provided the contested instruction. *See* Tenn. R. App. P. 27(a)(7). Of course, this court "may only review what is in the record and not what might have been or should have been included." *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). We note that the Defendant included a brief quote from the trial court's findings in his appellate brief, but he otherwise failed to support his claim that the trial court provided an erroneous and prejudicial jury instruction with citations to authority or argument. Because the Defendant's brief does not comply with Tennessee Rule of Appellate Procedure 27(a)(7), we must conclude, regretfully but respectfully, that he has waived appellate consideration of the issues raised. *See Moss*, 2023 WL 5702902, at *5.

## H.    INCONSISTENT THEORIES

The Defendant asserts that the State's pursuit of the "heinous, atrocious, or cruel" aggravating factor, *see* Tenn. Code Ann. § 39-13-204(i)(5) (Supp. 1994), during the penalty phase of his trial was inconsistent with the State's assertion during the co-defendant's subsequent trial that the evidence did not support the aggravating factor. He maintains that the State engaged in prosecutorial misconduct and violated his rights to due process of law.

The Defendant alleged in his amended motion for a new trial that the State presented inconsistent theories during his and the co-defendant's trials regarding the level of their respective participation in the offenses, a claim which our supreme court previously rejected. *See State v. Housler*, 193 S.W.3d 476, 491-93 (Tenn. 2006). In this appeal, however, the Defendant has changed the argument to focus on allegedly inconsistent arguments made during the *penalty phase* regarding the "heinous, atrocious, or cruel" aggravating factor.

The Defendant's assertion about inconsistent arguments raised during the penalty phase was not timely raised in his motion for a new trial. During the hearing on the Defendant's amended motion for a new trial, the trial court granted the Defendant the opportunity to submit late-filed exhibits, but it prohibited him from raising any new claims that had not been raised in his amended motion for a new trial. The trial court's prohibition

notwithstanding, the Defendant attached "factual points" to his late-filed exhibits, thereby attempting to raise the inconsistent-argument issue for the first time. The Defendant's attempt to raise a new inconsistent theory claim following the hearing was prohibited by the trial court, and the trial court did not address the new claim in its order denying the amended motion for a new trial. Accordingly, we must conclude that this issue is waived due to a failure to properly preserve it in the trial court.[6] *See* Tenn. R. App. P. 3(e); *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for a new trial).

## I. RECUSAL OF THE TRIAL JUDGE

The Defendant next asserts that the trial judge performed an "extrajudicial investigation" into media personnel's actions regarding the use of the video camera during jury deliberations. He argues that the judge was a material witness and should have recused himself from the evidentiary hearing regarding the video camera use during jury deliberations. The Defendant also asserts that the trial judge was required to recuse because he demonstrated bias during the trial and post-trial proceedings. The State responds that the Defendant has waived some of his claims by failing to seek recusal during the trial and that regardless of waiver, the Defendant is not entitled to relief.

"Tennessee litigants are entitled to have cases resolved by fair and impartial judges." *Cook v. State*, 606 S.W.3d 247, 253 (Tenn. 2020) (citations omitted); *Anderson v. State*, 692 S.W.3d 94, 109 (Tenn. Crim. App. 2023). A trial judge should grant a motion to recuse if the judge has any doubts regarding his or her ability to preside impartially in the case. *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995); *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). However, a trial judge should also grant a recusal "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Alley*, 882 S.W.2d at 820 (citation omitted); *Anderson*, 692 S.W.3d at 94, 109.

The Defendant did not file a motion to recuse in the trial court based on the trial judge's conduct during the pre-trial and trial proceedings. Recusal motions should be filed when "the facts forming the basis of that motion become known." *Bean v. Bailey*, 280 S.W.3d 798, 803 (Tenn. 2009) (citation omitted). "A litigant cannot manipulate the judicial process by knowing of allegedly improper judicial conduct but remaining silent until after the legal matter has been resolved unfavorably to the litigant." *Cook*, 606 S.W.3d at 254

---

[6]     In the Defendant's reply brief, he requests that the appellate record be supplemented with the transcript of the closing arguments from the penalty phase of his trial. Because we have concluded that the Defendant has waived his claim of inconsistent theories related to the application of the "heinous, atrocious, or cruel" aggravating factor, we respectfully deny his motion to supplement.

(citation omitted). A litigant risks waiver by failing to file a motion to recuse or by not filing it in a timely manner. *Id.* We conclude that the Defendant waived his arguments regarding the trial judge's conduct during the trial by failing to file a motion to recuse. Notwithstanding waiver, the Defendant is not entitled to relief.

### 1. Material Witness

The Defendant contends that the trial judge conducted an improper independent investigation into the media personnel's actions in moving the video camera inside the courtroom during jury deliberations. He maintains that, as a result, the trial judge was a material witness and should have recused himself from the evidentiary hearing.

We note that a "judge is not permitted to make an investigation of a case, even an inadvertent one, off the record, and then base a holding on the information obtained." *State v. Hart*, 911 S.W.2d 371, 376 (Tenn. Crim. App. 1995) (quoting *Vaughn v. Shelby Williams of Tenn., Inc.*, 813 S.W.2d 132, 133 (Tenn. 1991)). One of the dangers of such an investigation is that it could lead to the judge's becoming a "material witness," which is defined as "a person who can testify about matters having some logical connection with the consequential facts, especially if few others, if any, know about those matters." *Hill Boren Properties v. Boren*, No. W2019-02128-COA-T10B-CV, 2020 WL 119738, at *4 (Tenn. Ct. App. Jan. 10, 2020) (quoting *Black's Law Dictionary*, 1839 (10th ed. 2014)), *no perm. app. filed*.

The record reflects that due to the number of exhibits entered at trial, the trial judge allowed the exhibits to remain in the courtroom and permitted the jurors access to both the jury room and the courtroom to view the exhibits during deliberations. During a hearing outside the jury's presence the following day, the trial judge disclosed that he visited the media room after the jury began deliberations. There, he discussed with media personnel the importance of maintaining the integrity of the courtroom, particularly because the video camera inside the courtroom was still operational. The media personnel provided the judge with microphones to prevent any possibility of overhearing the jurors while they were in the courtroom during deliberations. Based on their discussion, the judge agreed to focus the video camera on the ceiling and instructed them to turn off their large monitor inside the media room. However, he allowed them to keep a small monitor on to ensure the camera remained in the agreed-upon position. The judge emphasized that he made it clear to the media personnel that moving the camera would compromise the integrity of the jury room and could potentially lead to a mistrial.

The trial judge explained that around 5:00 p.m. the previous day, the circuit court clerk informed him that a deputy had passed through the media room and noticed both the

small and large monitors were on, showing the trial bench instead of the ceiling. Upon investigating, the judge confirmed the deputy's observations were accurate. When he confronted the media personnel, they admitted they had turned on the large monitor and adjusted the camera to see if the court had resumed session. The judge asked one of the personnel if he had seen any movement from the jurors, and the man denied seeing anything.

The judge identified two key issues arising from the media personnel's actions: whether their behavior amounted to criminal contempt due to their apparent disobedience of the court's order, and whether the integrity of the jury room had been compromised. The judge indicated he was willing to set aside the contempt issue to allow the parties to question the media personnel on the record, to determine if the jury room had been breached. The Defendant then moved for a mistrial, and both the Defendant and the State called multiple witnesses to testify about their understanding of the court's instructions and the camera's movement. None of the witnesses reported seeing any jurors, exhibits, or other movement in the courtroom once the camera was repositioned. At the end of the hearing, the judge denied the Defendant's mistrial request, concluding that the evidence did not show that the media personnel's actions had interfered with the jury's deliberations.

The pertinent issue during the evidentiary hearing was *not* whether the media personnel violated the trial court's instructions. It was whether the use of the video camera was an improper external influence on the jury's deliberative process, an issue about which the trial court had no independent knowledge. The record does not reflect that the trial judge's observations, which prompted him to conduct the hearing, rendered him a material witness or influenced his ruling. We conclude that a person of ordinary prudence in the judge's position would not find a reasonable basis for questioning the trial judge's impartiality on this basis.

### 2. Bias

The Defendant asserts that the trial judge's actions during the trial and post-trial proceedings created a "constitutionally intolerable likelihood of personal bias and hostility that permeated the entire proceedings and violated [the Defendant's] due process rights to an impartial magistrate." The terms "bias" and "prejudice" generally "refer to a state of mind or attitude that works to predispose a judge for or against a party." *Alley*, 882 S.W.2d at 821 (citing 46 Am. Jur. 2d "Judges" § 167 (1969)). Not every bias or prejudice requires recusal; instead, to warrant recusal, "prejudice must be of a personal character, directed at the litigant, must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from participation in the case." *Id.* (citation, omission, and internal quotation marks omitted).

The Defendant asserts that recusal was warranted because, before the Defendant's trial, the trial judge presided over a civil lawsuit filed by the family of one of the victims against Taco Bell. We respectfully disagree. When analyzing a trial judge's prior knowledge of a case, there is a distinction "between a judge's knowledge obtained by virtue of his position in an earlier, related proceeding and knowledge obtained outside the courtroom." *Harris v. State*, 947 S.W.2d 158, 172 (Tenn. Crim. App. 1996). We have recognized that "to disqualify, prejudice 'must stem from an *extrajudicial* source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case.'" *Id.* (quoting *Alley*, 882 S.W.2d at 821). Indeed, "[a] judge is in no way disqualified because he tried and made certain findings in previous litigation." *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995) (citing *King v. State*, 391 S.W.2d 637, 642 (Tenn. 1965)). After all, "the judicial system could not function if judges could deal but once in their lifetime with a given defendant, or had to withdraw from a case whenever they had presided in a related or companion case or in a separate trial in the same case." *United States v. Cowden*, 545 F.2d 257, 265-66 (1st Cir. 1976). Therefore, the trial court's presiding over a civil case that arose from the same events did not require that the trial court recuse itself from the Defendant's case.

The Defendant alleges that the trial court demonstrated bias during the evidentiary hearing addressing the movement of the video camera during jury deliberations by refusing "to voir dire the jurors individually despite knowing that they could plainly see a camera with a live video feed being moved in the jury room during deliberations." The record includes no statement from the trial judge prohibiting the parties from questioning the jurors. The trial judge allowed the parties to call any witness to testify during the hearing, and neither party sought to question any of the jurors. Further, the record does not support the Defendant's claim that the jurors saw the video camera being moved. The record does not support the Defendant's claim that, on the day before the hearing, witnesses informed the trial judge they saw jurors through the video camera monitors during deliberations, only to change their testimony during the evidentiary hearing.

The Defendant makes several claims about a private meeting between the trial judge and trial counsel after the trial but before the first hearing on the motion for a new trial. During post-conviction proceedings, the Defendant argued that the judge should have recused himself due to this meeting. However, in the previous appeal, we concluded that the trial judge's failure to recuse himself did not justify a new trial or hearing, nor did it make him unfit to serve as the thirteenth juror. *Mathews*, 2019 WL 7212603, at *30-32. Although we allowed the Defendant to file a renewed motion for a new trial, we did so "due to the failures of trial counsel" and "not based upon the actions or rulings of the trial judge." *Id.* at *32.

The Defendant also claims that the trial judge should have recused himself because he falsely stated that he had reviewed the sentencing hearing transcript for the especially aggravated robbery conviction, even though the transcript was never prepared. The Defendant also argues that the trial judge falsely stated that, by the time of the co-defendant's direct appeal, the Defendant's motion for a new trial had already been denied and his appeal was pending. The Defendant bases this claim on a certificate signed by the judge and attached to the appellate record in the co-defendant's appeal.

These arguments are moot in light of the Defendant's previous appeal. There, we granted the Defendant a new hearing before a different judge. We also determined that the trial judge's actions did not render him unfit to serve as thirteenth juror. The Defendant's additional post-trial claims do not change those conclusions. *Id.* at *31-32. He is not entitled to relief on this issue.

### J.    CUMULATIVE ERROR

Finally, the Defendant argues that he is entitled to a new trial due to the prejudice accruing from the cumulative effect of the errors. The cumulative error doctrine applies when there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). We have held that the Defendant waived several issues and otherwise failed to establish error. We have concluded that any errors by the trial court in failing to issue an enhanced identification instruction and in failing to allow the parties the opportunity to present additional closing arguments after the trial court issued a supplemental jury instruction on criminal responsibility during jury deliberations were harmless.

The Defendant also urges this court to consider the conclusions reached in our decision on post-conviction to examine the cumulative effect of the errors. *See Mathews*, 2019 WL 7212603, at *21-41. To the extent that the Defendant relies upon this court's determination regarding trial counsel's conduct post-trial, we note that we remedied these concerns in the previous appeal by allowing the Defendant to file a renewed motion for a new trial and seek a new direct appeal. *Id.* at *40.

We previously held that the trial court's failure to instruct the jury on lesser-included offenses was harmless error and that trial counsel's failure to pursue instructions did not result in prejudice, as "there is no reasonable probability that a properly instructed jury would have convicted on the lesser-included offenses." *Id.* at *34-36. We also held that even if the Defendant was absent when the trial court provided the jury with the

supplemental jury instruction on criminal responsibility, the error was harmless and that any failure by trial counsel to secure the Defendant's presence did not result in prejudice. *Id.* at \*38-39.   This court determined that the cumulative effect of trial counsel's deficiencies during the trial did not result in prejudice in light of the "overwhelming" evidence of the Defendant's guilt.  *Id.* at \*40.  We conclude that the inclusion of the trial court's failure to provide an enhanced identification instruction in accordance with *Dyle* does not alter our conclusion that the Defendant is not entitled to relief when such errors are considered individually or cumulatively in light of the overwhelming evidence establishing the Defendant's guilt.

## CONCLUSION

In summary, we hold that any errors in failing to provide an enhanced identity instruction and in not allowing additional closing arguments after a supplemental jury instruction were harmless.  Finding no other error, we respectfully affirm the judgments of the trial court.

_____
TOM GREENHOLTZ, JUDGE

- 35 -